## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **SENECA SMITH (#K-76299),** | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. 10 C 6395 |
| | ) | |
| v. | ) | Judge Elaine E. Bucklo |
| | ) | |
| **THOMAS J. DART, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Seneca Smith (hereinafter, "Plaintiff" or "Smith"), presently in state custody at Stateville Correctional Center, has filed suit pursuant to 42 U.S.C. § 1983. Smith alleges that on January 22, 2010, Defendants Martierie, Farris, Blunt, Conley, Alvarez, and Wilson, violated his constitutional rights by failing to provide adequate medical care for a serious medical condition at the Cook County Jail when he was denied treatment for a serious mental health condition. On the date in question, Plaintiff swallowed pills in an apparent suicide attempt. Plaintiff further alleges that Defendants Conley, Piemonte, and Ramos subjected him to excessive force because Defendant Conley used a chemical agent on Plaintiff after he swallowed the pills, and Defendants Piemonte and Ramos tackled him and banged his head on the floor.

Presently pending before the Court are Defendants' motions for summary judgment (Docs. 98 and 103) and Plaintiff's motions in response to Defendants' material statement of facts and supporting exhibits (Docs. 122 and 132), In their motions for summary judgment Defendants argue that Plaintiff has: (1) failed to show that Defendants were deliberately indifferent; and (2) failed to establish that Defendants Conley, Piemonte, and Ramos, subjected Plaintiff to excessive force. Defendant Martierie also argues in her motion that she is entitled to qualified immunity.

The record before the Court establishes that Plaintiff has failed to establish either deliberate indifference or the use of excessive force. Thus, for the reasons stated herein, Defendants' motions for summary judgment are granted.

## I. LEGAL STANDARD

### STANDARD OF REVIEW ON A MOTION FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Universities Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009), *citing Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

However, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Information Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan v. Cook*

*County Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010), *quoting Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008).

**Local Rule 56.1 (N.D. Ill.)**

Defendants filed statements of uncontested material facts pursuant to Local Rule 56.1 (N.D. Ill.). Together with their motion for summary judgment, Defendants included a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" (Doc. 66), as required by Local Rule 56.2. That notice clearly explained the requirements of the Local Rules and warned Plaintiff that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *See, e.g., Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

> (3) a concise response to the movant's statement that shall contain
>
> (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
>
> (B) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

L.R. 56.1(b).

The district court may rigorously enforce compliance with Local Rule 56.1. *See, e.g., Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings") (citing *Ammons v. Aramark*

*Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Although *pro se* plaintiffs are entitled to lenient standards, compliance with procedural rules is required. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *see also Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1108 (7th Cir. 2004).

While Plaintiff disputes 26 of Defendants' collective 88 proposed statements of fact (statements ##9, 16-18, 21, 24, 27-28, 30, 37, 44, 50-51, and 54 of Defendants' Conley, Farris, Blunt, Alvarez, Wilson, Ramos, and Piemonte's motion, and ##4, 20, 22-29, and 31-33 of Defendant Martierie's motion), many of Plaintiff's responses are improper, because they are argumentative, make conclusory statements, and are based on statements from an affidavit that contradict prior testimony.

Because Plaintiff is proceeding *pro se*, the Court will consider the factual assertions he makes in his response, but only to the extent that Plaintiff could properly testify about the matters at trial – that is, only with respect to those facts within Plaintiff's personal knowledge. See FED. R. EVID. 602.

**II.    FACTS**

The following facts are taken from Defendants' Rule 56.1 statement, from the record attached to Defendants Rule 56.1 statement, and from Plaintiff's response to Defendant's motion for summary judgment to the extent that the facts are within Plaintiff's personal knowledge.

Plaintiff was a pretrial detainee at the Cook County Department of Corrections ("CCDOC"). (Defendants' A, p.4).  In his complaint, Plaintiff alleges that he was denied medical treatment after allegedly swallowing pills in an attempt to commit suicide. *Id.* Plaintiff claimed that he was maced without reason and warning by Sergeant Conley after allegedly swallowing various pills he accumulated in his cell. *Id.* Plaintiff further alleges that Officer

4

Ramos and Officer Piemonte tackled him to the ground causing him to bang his head on the ground. *Id.*

On January 22, 2010 Plaintiff was housed in Division 10 of the Cook County Department of Corrections ("CCDOC"), which is a medical tier. (Plaintiff's Deposition Transcript attached to Defendants' motion as Exhibit C, 56:15-17). On that day, Plaintiff was ordered by Officer Martierie to pack his belongings and prepare for a transfer to Division 9 of CCDOC. (Defendants' Exhibit C, 59: 11-15). Officer Martierie was employed as a Cook County Correctional Officer working the 7am-3pm shift in Division 10 Tier 4B. (Martierie. Ex. C, ¶¶ 1 and 2).

At the beginning of Officer Martierie's shift she received a phone call from the Division 10 intake desk that she was to direct Plaintiff to pack his belongings as he was being transferred to a different cellhouse. *Id.* at ¶ 6. After receiving the phone call, Officer Martierie walked from her locked work area, through the day room to Plaintiff's cell. He was standing at the locked cell door window. *Id.* at ¶ 7. Through the locked door Officer Martierie informed Plaintiff that he should pack his belongings because he was being transferred. *Id.*

Plaintiff objected to the order to pack his belongings for a transfer to Division 9, stating that he would "rather be dead than be transferred to Division 9". *Id.* at ¶ 9, also see Defendants' Exhibit C, p 60: 21-23. While the particulars of the dialogue between Plaintiff and Officer Martierie are contested, it is uncontested that Plaintiff's objection was sufficiently serious that Officer Martierie was forced to contact a supervisor for assistance. *Id.* at ¶ 10.

Division 9 consists of general population and segregation. (Defendants' Exhibit C, 59-60: 22-2). Plaintiff believed that Division 9 was a nightmare and he "did not like it over there, period." (Defendants' Exhibit C, 61: 15, 21-23). After being told that he was being transferred to

5

Division 9, Plaintiff testified that he asked several people for psychological evaluations. (Defendants' Exhibit C, 62: 1-2).

Sergeant Conley, the night supervisor, and 5-6 other correctional officers responded to the call and came to Tier 4B. *Id.* at ¶ 11. When back-up arrived, Sergeant Conley, the correctional officers, and Officer Martierie went to Plaintiff's cell. Plaintiff's cell was unlocked. *Id.* at ¶ 12. Sergeant Farris arrived on the tier as a back up officer for Sergeant Conley. (Defendants' Exhibit D, ¶5).

Sergeant Conley spoke with Plaintiff directly and Plaintiff appeared to calm down and began packing his belongings. (Defendants' Exhibit D, ¶7). Plaintiff testified that "[he] didn't want to argue too much, so [he] was a little loud, but [he] went in there and packed, and that's what [he] was doing." (Defendants' Exhibit C, 65: 12-14). Once it appeared that Plaintiff was cooperative and complying with orders Sergeant Farris left the tier. (Defendants' Exhibit D, ¶8, Defendant Sergeant Farris' Answers to Plaintiff's Interrogatories as Exhibit E, p. 2). Sergeant Conley remained at Plaintiff's cell watching him as he packed his belongings. (Defendants' Exhibit D, ¶9).

While Plaintiff was packing he notified Sergeant Conley that he was going to kill himself, and began to gather what appeared to be pills. (Defendants' Exhibit D, ¶10). Plaintiff ingested twenty pills within seconds of saying out loud or thinking to himself that "he'd rather kill himself" than be transferred to Division 9. (Defendants' Exhibit C, 62: 7-18 and 64: 8-12). Sergeant Farris was not present on the tier when Plaintiff allegedly swallowed the pills and had no knowledge of Plaintiff swallowing pills once he was placed in the intake area. (Defendants' Exhibit E, Farris' Answers to Plaintiff's Interrogatories).

6

In response to Plaintiff's swallowing the pills, Sergeant Conley deployed a burst of O.C. spray at Plaintiff. (Defendants' Exhibit D, ¶11). Plaintiff's face, eyes and hair were sprayed with the O.C. spray. (Defendants' Exhibit C, 66: 1-3). Plaintiff acknowledged that he was sprayed with the O.C. "fast, because [he] swallowed them so fast." (Defendants' Exhibit C, 65: 1-2).

Officer Piemonte and Officer Ramos entered Plaintiff's cell and handcuffed Plaintiff. (Defendants' Exhibit D, ¶13). Plaintiff alleges that Officer Piemonte and Officer Ramos entered his cell and tackled him to the ground and Plaintiff banged his head against the floor. (Defendants' Exhibit A, p. 4). Plaintiff sustained a "lump on [his] head." (Defendants' Exhibit C, 74:19-21).

The incident was recorded by Officer Cashen and assigned a videotape no. 2010-0028. (Defendants' Exhibit D, ¶12). Video footage of the incident consists of approximately twelve minutes. (Defendants' Exhibit G, dvd of the January 22, 2010, video footage.). Video footage of the January 22, 2010 incident begins after Plaintiff was sprayed with OC spray by Sergeant Conley. *Id.*

Immediately after being subdued, Plaintiff was escorted to the dispensary for medical treatment for exposure to a chemical agent. (Defendants' Exhibit C, 66: 4-9,14). Inmates sprayed with O.C. spray receive immediate medical attention before they can be moved to another Division or returned to their cell. (Defendants' Exhibit D, ¶17). After receiving treatment at the dispensary Plaintiff was placed in a bullpen in the Intake area of Division 10 for transfer to Division 9. (Defendants' Exhibit C, 66: 20-23). Plaintiff was still agitated when placed in the bullpen, but once he "stopped doing all this jumping around" he told both Sergeant Conley and

Sergeant Farris that he needed to see a doctor because he didn't receive treatment for the pills he swallowed. (Defendants' Exhibit C, 67-68: 17-3).

Lieutenant Alvarez and Officer Wilson were present in Intake of Division 10, but have no independent recollection of Plaintiff being present in the intake area of Division 10 on January 22, 2010. (See generally Defendants' Exhibit E, Defendants' Individual Answers to Plaintiff's Interrogatories).

Medical personnel evaluate and treat all inmates arriving at the dispensary unit. If additional medical treatment is required medical personnel will refer an inmate to Cermak Hospital for further medical treatment. (Defendants' Exhibit D, ¶18, Dr. Leslie Stein's Affidavit attached hereto as Exhibit F, ¶17). An inmate is returned to the tier once he has been cleared by medical personnel. (Defendants' Exhibit F, ¶18).

Approximately thirty minutes after being placed in the bullpen Plaintiff told jail personnel that he wasn't feeling good and was escorted to Cermak by Officer Patton. (Defendants' Exhibit C, 68: 6-7: 13-19). Plaintiff does not recall fully the type of treatment he received while in Cermak. (Defendants' Exhibit C, 69: 8-10).

Dr. Stein treated Plaintiff on January 22, 2010. (Defendants' Exhibit F, ¶3). Plaintiff was referred to Mental Health Services for evaluation based on his inappropriate behavior and due to his dislike of being transferred to Division 9. (Defendants' Exhibit F, ¶7). Dr. Stein's evaluation noted that Plaintiff was treated earlier in the day in Division 10 but did not wish to be evaluated by Mental Health Services. (Defendants' Exhibit F, ¶15, and see Martierie's Exhibit H).

Dr. Stein's evaluation did not indicate any evidence of an overdose however, Plaintiff mentioned taking pills during the examination. (Defendants' Exhibit F, ¶10). Plaintiff did not complain of any side effects of overdosing on medication nor did he complain of losing

8

consciousness earlier in the day. (Defendants' Exhibit F, ¶11). During Dr. Stein's evaluation, Plaintiff did not complain of not receiving medical treatment for taking the pills that he ingested that day. (Defendants' Exhibit F, ¶12). During his evaluation with Dr. Stein, Plaintiff threatened to kill himself. (Defendants' Exhibit F, ¶8). Based on her assessment and professional opinion, Dr. Stein referred Plaintiff to the psychiatric unit for evaluation. (Defendants' Exhibit F, ¶9).

### III. ANALYSIS

**Deliberate Indifference**

The governing law is well settled. A jail "certainly has an obligation to provide for the psychiatric care of its inmates pursuant to its constitutional obligation to address their serious medical needs." *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 676 (7th Cir. 2012) (*citing Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)). Incarcerated persons are entitled to confinement under humane conditions which provide for their basic human needs. *Rice*, 675 F.3d at 664 (citations omitted). Inmates must, for example, receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "Although the Eighth Amendment applies only to convicted persons, pretrial detainees ... are entitled to the same basic protections under the Fourteenth Amendment's due process clause," and the courts apply the same deliberate indifference standard in both types of cases. *Rosario v. Brawn*, 670 F.3d 816, 820-21 (7th Cir. 2012) (*quoting Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010)).

In addition to providing for an inmate's basic needs, jail officials have a duty to protect them. *Rice*, 675 F.3d at 669. The Constitution imposes on jail officials a duty to "take reasonable

measures to guarantee the safety of the inmates and to protect them from harm..." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (*quoting Farmer*, 511 U.S. at 832-33). Correctional officials incur liability for the breach of that duty when they are aware of a substantial risk of serious injury to an inmate but nevertheless fail to take appropriate steps to protect him from a known danger. *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007); *see also Santiago v. Walls*, 599 F.3d 749, 758-59 (7th Cir. 2010) (cases involving an alleged failure to prevent assaults by fellow inmates).

Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer*, 511 U.S. at 837; *Estelle v. Gamble*, 429 U.S. 97, 103-04, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *see also Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011). In suicide cases, the objective element "is met by virtue of the suicide itself, as it goes without saying that suicide is a serious harm." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (*quoting Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001)). However, in the case at bar, Plaintiff cannot meet the subjective prong.

Where the harm at issue is a suicide or attempted suicide, the subjective component of an Eighth or Fourteenth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk. *Collins*, 462 F.3d at 761 (*citing Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003); *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (defendant must be aware of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing the act). With respect to the first showing, "it is not enough that there was a

danger of which a prison official should have been aware," rather, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Novack*, 226 F.3d at 529. In other words, the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life. *Id*.; *Sanville*, 266 F.3d at 737 (issue is whether the defendant was subjectively "aware of the substantial risk that [the deceased prisoner] might take his own life"). Liability cannot attach where "the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk." *See Collins*, 462 F.3d at 761; *citing Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir. 2001).

In *Collins*, the inmate told a correctional officer that he wanted to see the prison crisis counselor because he was feeling suicidal. The officer relayed the request up the chain of command, but as the request was passed along, the information that the inmate was feeling suicidal was apparently dropped and the message was transmitted as a generic request to see the crisis counselor. When an officer told the inmate that a counselor had been called and would respond as soon as she could, the inmate responded that he was "all right" and could wait until the counselor arrived. Tragically, however, during the next hour or so the inmate hanged himself in his cell using a bed sheet.

The U.S. Court of Appeals for the Seventh Circuit affirmed the district court's entry of summary judgment in favor of prison officials. Some of the defendant officers were unaware that the plaintiff had expressed any suicidal impulses; the record reflected that inmates "often request meetings with crisis counselors for reasons both serious and mundane, and sometimes make such requests as a means of manipulating prison staff," *Collins*, 462 F.3d at 761,

The case at bar presents a slightly different scenario in that Defendants are all alleged to have essentially ignored Plaintiff's pleas. But in this case, the record indicates an emerging situation. Plaintiff told Defendant Martierie that he would rather be dead than move to Division 9. She left his cell and immediately contacted a supervisor, following protocol for the situation. Defendant Conley and other staff, including Defendants Farris, Piemonte and Ramos, went to Plaintiff's cell to deal with Plaintiff and his objection to being transferred. Once Defendant Conley spoke to Plaintiff he seemed to calm down and began to pack his belongings, but then, suddenly took approximately twenty pills he had stockpiled in his cell. Defendant Conley discharged a chemical agent at Plaintiff, spraying him in the face, eyes, and hair. Defendants Piemonte and Ramos entered Plaintiff's cell, pushed him to the ground and placed him in handcuffs. Defendant Farris was no longer at the scene of the incident.

Defendants have included as an exhibit a video-tape depicting Plaintiff's removal from his cell and the treatment he received for a chemical agent. The video is approximately twelve minutes long and, aside from when Plaintiff is receiving medical treatment, is continuous. To the extent that Plaintiff is attempting to allege deliberate indifference for the care he received for exposure to a chemical agent, based on the evidence in the record, no reasonable jury could determine that any Defendant was deliberately indifferent with regard to the treatment Plaintiff received for the effects of a chemical agent. *See Scott v. Harris,* 550 U.S. 372, 380-81 (2007).

Plaintiff does not complain once during the video about needing treatment for the pills he allegedly swallowed. He merely complains about having been sprayed with a chemical agent. He was taken to a holding cell. While in the holding cell, he apparently had contact with Defendants Alvarez and Wilson, but they have no memory of Plaintiff from the day in question. Within a half an hour, once Plaintiff complained to Defendants Conley and Farris about feeling

12

unwell, he was seen by Dr. Stein for a psychological consult. Dr. Stein noted in her record of the meeting that Plaintiff was treated earlier in the day, but refused mental health services. During their session, Dr. Stein made note that Plaintiff spoke of taking pills. Based on Plaintiff's behavior, she referred him to the psychiatric unit at Cermak Health Services for evaluation.

Deliberate indifference requires a showing of "more than mere or gross negligence." *Collins*, 462 F.3d at 762 (*quoting Matos*, 335 F.3d at 557; *Estate of Novack*, 226 F.3d at 529). The required showing is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins*, 462 F.3d at 762 (*quoting Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992)). To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to inmate health or safety. *Matos*, 335 F.3d at 557. A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] ... his action must be reckless before § 1983 liability can be found." *Collins*, 462 F.3d at 762 (*quoting Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003) (emphasis added).

Additionally, this incident cannot be considered in a vacuum: the Court examines the totality of the medical care provided in assessing whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999); *Smith v. Hallberg*, No. 11 C 0188, 2012 U.S. Dist. LEXIS 137347, 2012 WL 4461704, *8 (N.D. Ill. Sep. 25, 2012) (Bucklo, J.). Plaintiff in the instant case was housed in a mental health care unit. Even though Plaintiff either threatened to commit suicide, or stated that "he would rather be dead than transferred to Division 9, nothing in the record indicates that Defendants were aware that he had any way of doing himself harm. Plaintiff concedes that he was sprayed with a chemical agent because he

took the pills fast. The record is clear that it was not until Plaintiff actually took the pills, or immediately prior, that any Defendant had actual knowledge that Plaintiff intended to do harm to himself. The only Defendants present at the time were Defendants Conley, Piemonte, and Ramos, who took swift action, documented on video tape, to restore order, and take Plaintiff to the health care unit, and ultimately for a consultation with psychiatrist, Dr. Stein. After that consult, Plaintiff was sent to Cermak Health Services for further treatment.

While Plaintiff alleges that he told Officer Martierie that he was going to harm himself and needed a psychiatric consult, she took action, calling Defendant Conley. Defendant Conley took action when Plaintiff swallowed the pills, then Defendants Piemonte and Ramos took him to get health care for his eyes and skin due to a chemical agent, and once finished, when Plaintiff was placed in a holding cell, when he began complaining of feeling unwell, he saw a psychiatrist within thirty minutes who referred him for further psychiatric care. To the extent that Plaintiff's claim is for delay in treatment, the time period indicated by the record is insufficient, and there is no indication that any delay exacerbated any injury or unnecessarily prolonged Plaintiff's pain or discomfort. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

The record indicates that the situation in Plaintiff's cell occurred very quickly, and rapidly escalated. Liability does not attach where, as here, Defendants were not alerted to the likelihood that the plaintiff was a genuine suicide risk, as opposed to simply acting out because he did not get his way about staying in Division 10. *Compare Boncher*, 272 F.3d at 488 (defendants were not liable for suicide where the officers thought the plaintiff was joking about his previous suicide attempts and mental state). Moreover, Defendants' swift action when Plaintiff actually followed through on his threat further belies any inference of deliberate indifference.

Furthermore, had Plaintiff not stockpiled medications, he would not have been able to take an overdose of the pills. As a general rule, where an inmate is the cause of the conditions about which he complains, any constitutional claim is rendered tenuous. *See, e.g., Isby v. Clark*, 100 F.3d 502, 505-06 (7th Cir. 1996) (if an inmate fouled his own cell, his Eighth Amendment claim would "lose a lot of its steam" and he would "not have a cruel and unusual leg to stand on"). But even if the court ascribes Plaintiff's actions to mental illness rather than willful misbehavior, Defendants cannot be held liable for his sudden and unexpected act of taking pills. Accordingly, Plaintiff's claim of deliberate indifference fails, and this claim is dismissed. Defendant Martierie argues in her motion that she is entitled to qualified immunity but because the Court has found no constitutional violation, the Court declines to consider the argument as it is unnecessary.

**Excessive Use of Force by Defendants Conley, Piemonte, and Ramos**

The record indicates that Defendant Conley, when faced with Plaintiff suddenly swallowing a large number of pills, used a chemical agent to subdue him. With regard to the use of chemical agents, "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). *See also Stringer v. Rowe*, 616 F.2d 993, 999 (7th Cir. 1980) (stating that the "use of chemical agents such as tear gas and mace by prison officials to subdue individual prisoners, rather than to quell large disturbances, should be more restricted."). In *Soto* the court explained,

> The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth Amendment, whether an inmate is locked in his cell or not. What we, and other courts have held, is that the appropriateness of the use must be determined by the facts and circumstances of the case …. The use of mace,

>tear gas or other chemical agents of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment.

*Soto*, 744 F.2d at 1270. In the present case, Defendant Conley was faced with an inmate, Plaintiff, refusing to follow orders, and threatening to harm himself. Plaintiff appeared to calm down and begin to pack, and then suddenly swallowed twenty pills that he had hidden in his cell, seemingly making good on his threat. The Court finds that the use of a chemical agent, considering the circumstances Defendant Conley faced at the time, was reasonable. There is some question as to the amount of agent deployed by Defendant Conley, but the record indicates that it was one burst at between one-second and one-minute in duration. The amount deployed under the facts presented was reasonable, especially in light of how obstreperous and self-destructive Plaintiff was behaving.

With respect to the force employed by Defendants Piemonte and Ramos, the record indicates that they entered Plaintiff's cell, after Conley discharged a chemical agent, tackled Plaintiff and placed him in hand cuffs. At worst, Plaintiff banged his head during the incident, causing a lump.

Correctional officers have the right to use reasonable force against a prison inmate to enforce discipline and to maintain institutional security. *Hudson v. McMillian*, 503 U.S. 1, 7, 117 L. Ed. 2d 156, 112 S. Ct. 995 (1992). However, it is well settled that the intentional use of excessive force by prison guards against an inmate without penological justification constitutes cruel and unusual punishment violative of the Eighth Amendment. *Id*.; *Knox v. Wainscott*, 2003 U.S. Dist. LEXIS 13785, No. 03 C 1429, 2003 WL 21148973, at *6 (N.D. Ill. May 14, 2003 (Manning, J.). (While the Fourteenth rather than the Eighth Amendment applies to pretrial detainees, the same basic standards govern. *See Salazar v. City of Chicago*, 940 F.2d 233, 239-

240 (7th Cir. 1991)). Whenever correctional officials stand accused of using excessive physical force in violation of the Constitution, "the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000), *quoting Hudson*, 503 U.S. at 6-7 (internal quotations omitted). Based upon the facts presented no reasonable jury could find that the force used by Defendants Piemonte and Ramos was excessive, and that their actions represented a good faith effort to restore order and prevent Plaintiff from doing himself any further harm. Because the record supports a finding that the actions of Defendants Conley, Piemonte and Ramos were reasonable under the circumstances, Plaintiff's claim of excessive force against them fails.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (Docs. 98 and 103) are granted and Plaintiff's motions in response to Defendants' motion for summary judgment (Docs. 122 and 132) are denied as moot. This matter is closed on the Court's docket.

Dated: January 28, 2013

Hon. Elaine E. Bucklo
U.S. District Court Judge